SHERBERNEAU v METROPOLITAN LIFE INSURANCE
COMPANY

1. STATUTES—PROSPECTIVE EFFECT—RULES OF EVIDENCE.

Statutes as a general rule are given prospective effect; however,
there is an exception to this rule when the statute deals with a
rule of evidence.

2. STATUTES—DEAD MAN'S STATUTE—RETROACTIVE EFFECT.

The dead man's statute pertains to the admissibility of evidence,
is remedial legislation, and has retroactive effect (MCLA
600.2166).

3. EVIDENCE—ADMISSIBILITY—DEAD MAN'S STATUTE—CORROBORATING
EVIDENCE.

A party's own testimony which would otherwise be excluded
because of the dead man's statute becomes admissible provided
some material portion of his testimony is supported by some
other material evidence tending to corroborate his claim
(MCLA 600.2166[1]).

4. EVIDENCE—ADMISSIBILITY—DEAD MAN'S STATUTE—CORROBORATING
EVIDENCE.

The trial court, in an action to recover benefits under an insur-
ance policy, erred by refusing, because of the dead man's
statute, to admit the plaintiff's testimony that the premium for
the insurance policy had been paid to a deceased insurance
agent where other evidence indicated that the premium could
have been paid even though office records did not disclose
payment, that an overage was discovered in the agent's ac-
count, and that the defendant had picked out the purposes for
which the overage was to be allotted, and that an amount very
close to the premium due was credited or returned to plaintiff
out of the overage, since this was material evidence which
tended to corroborate the plaintiff's claim (MCLA 600.2166[1]).

REFERENCES FOR POINTS IN HEADNOTES
[1] 29 Am Jur 2d, Evidence § 9.
[2] 58 Am Jur, Witnesses § 214 *et seq.*
[3, 4] 29 Am Jur 2d, Evidence § 674.

Appeal from Grand Traverse, James M. Fitzpatrick, J. Submitted Division 3 November 9, 1972, at Lansing. (Docket No. 12495.) Decided January 16, 1973.

Complaint by Elsie A. Sherberneau against Metropolitan Life Insurance Company to recover benefits under an accident and health policy. Judgment for defendant. Plaintiff appeals. Reversed and remanded.

*Williams, Coulter, Forster & Cunningham* (by *William M. Davison),* for plaintiff.

*Menmuir & Zimmerman,* for defendant.

Before: R. B. BURNS, P. J., and HOLBROOK and DANHOF, JJ.

HOLBROOK, J. Plaintiff, Elsie A. Sherberneau, brought an action for $10,000, the principal amount of an accident and health policy issued by defendant, Metropolitan Life Insurance Company, January 1, 1961, to plaintiff's husband, Owen G. Sherberneau. Mr. Sherberneau was an agent of long standing for the defendant insurance company and wrote the application for the insurance policy in question and serviced the account by collecting the premiums as was his duty as agent.

Plaintiff asserted in her complaint *inter alia* that on August 3, 1966, Mr. Sherberneau died of accidental causes (carbon monoxide in the garage) and that as beneficiary she was entitled to receive the proceeds from the policy.

The defendant in his answer admitted that policy No. 3-475-682-AH was issued to plaintiff's husband as claimed by plaintiff. The defendant in its

answer denied liability on the policy and asserted
an affirmative defense that the premium due on
the policy on July 1, 1966, had not been paid by
that date nor had it been paid through the grace
period of 31 days ending August 1, 1966, and that
inasmuch as the death of the insured took place
after the policy had lapsed there was no liability.

The defendant offered its office records to prove
that the subject premium had not been paid. These
records were admitted.

In the trial Mrs. Sherberneau attempted to show
that she had paid the premium on July 15, 1966,
by handing to Mr. Sherberneau the cash therefor
together with the notice of premium due. This
testimony was objected to as violative of the Dead
Man's Statute, MCLA 600.2160; MSA 27A.2160.
The objection was sustained and the testimony was
not received.

Thereafter the plaintiff was permitted to make a
special separate record of her proffered testimony.

After hearing the testimony and considering the
exhibits and briefs of the parties, the trial court
found against the plaintiff and in favor of the
defendant, no cause of action.

Plaintiff on appeal asserts first that Mr. Sherber-
neau was an employee of defendant company and
was authorized to accept premium payments at
the time that she claims she paid the premium on
the subject policy of insurance. Plaintiff argues
that Mr. Sherberneau was merely performing an
administrative act in collecting premiums and,
therefore, was acting as an employee of the de-
fendant insurance company. She further asserted
that in her complaint she alleged that Mr. Sher-
berneau was an "employee" of defendant and that
the same was admitted in defendant's answer.
However, upon reading the pleadings, the wording

in paragraph 1 of the complaint appears as follows:

"That on August 2, 1966, Owen G. Sherberneau, husband of your plaintiff was an employee and a duly authorized agent for the defendant insurance company, assigned to their Traverse City, Michigan office."

This record discloses that Mr. Sherberneau was "an employee and a duly authorized agent for the defendant insurance company".

The record also discloses that Mr. Sherberneau listed his occupation as being an insurance agent on the application for the insurance policy in question. We also find in the record as follows the testimony of the district manager, Bernard C. Brown, as to Mr. Sherberneau's position with the defendant company:

"*Q.* Now, there is no question but what Mr. Sherberneau was employed for some time as a representative of the Metropolitan Life Insurance Company. What would his official capacity be?

"*A.* He was an agent at the time of his death for the company."

On cross-examination by plaintiff's counsel, Mr. Brown testified:

"*Q.* Now, as an agent of your company could you tell me just briefly what the job description entailed? What did he do for the company?

"*A.* Yes. An agent is employed as a salesman and he services accounts that are in force in his area. By service I mean collection of premiums due from policy holders that encompass or are included in this agency, sale of new life insurance and representing the company in all matters."

Mr. Brown also testified on cross-examination:

"*Q.* Let's confine ourselves to the sale of policies. Did his position allow him to contact with the general public on insurance policies?

"*A.* Yes, sir. I mean he was licensed in the State of Michigan for the sale—to represent Metropolitan Life Insurance Company."

The Insurance Code of 1956 provides:

"Sec. 2220. Any person who shall solicit an application for insurance upon the life of another shall, in any controversy between the insured or his beneficiary and the insurer issuing any policy upon such application, be regarded as the agent of the insurer and not the agent of the insured." MCLA 500.2220; MSA 24.12220.

Attached to the application for the policy in question, Mr. Sherberneau signed a statement, reading in part as follows:

"STATEMENT OF AGENT

The above application amendment form was signed by OWEN G. SHERBERNEAU in my presence before I delivered the policy on this 23 day of Jan., 1961.

"/s/ *Owen G. Sherberneau*        *Agt.*
                (Name)                              (Title)"

We rule that the evidence was more than sufficient to justify the trial court in finding as a matter of fact that Mr. Sherberneau was acting as an agent of the defendant insurance company in regard to this policy of insurance and the servicing of the policy by collecting premiums thereon.

We now restate the main question raised on appeal: In a cause of action occurring August 3, 1966, by a beneficiary against an insurance company on an accident insurance policy, when testimony of the beneficiary is offered to show that the premium payment was paid by the beneficiary, within the grace period to an agent of the com-

pany, and where competent testimony had been properly admitted showing that there was an unexplained overage in the account of the agent which was sufficient to cover the premium due, is the offered testimony inadmissible by reason of the dead man's statute?

The trial court answered this question in the affirmative and cited the dead man's statute that was in effect at the time of the death of the insured. MCLA 600.2160; MSA 27A.2160. The dead man's statute cited by the trial court was repealed by 1967 PA 263, effective November 2, 1967. The new dead man's statute, MCLA 600.2166; MSA 27A.2166, became effective November 2, 1967.

It is the claim of plaintiff that the statute in effect at the time of trial (October 17, 1969) was applicable to the instant case. It is true that statutes as a general rule are given prospective effect. 21 Michigan Law & Practice, Statutes, § 105, p 133. However, there is an exception to this general rule where the statute deals with a rule of evidence.

In the case of *Ritter v Seestedt*, 212 Mich 208, 211 (1920), a creditor was attacking the conveyance of a theater building by a husband to his wife as being in fraud of his creditors. A statute was passed after conveyance was made, and the statute provided that a prima facie case is made out when a plaintiff testifies as to the judgment, the levies made on the property, and the complained-of conveyance. The defendant argued that the statute did not apply because it was not passed until after the conveyance was made. The Court held for the plaintiff stating:

"The fact that the act was not in effect when the conveyance was made is not of much importance. It being a rule of evidence, it is excepted from the general

rules governing the interpretation of retroactive statutes."

Also see *Nash v Robinson,* 226 Mich 146 (1924).

The dead man's statute pertains to the admissibility of evidence, is remedial legislation, and has retroactive effect. Therefore, the statute to be applied in the instant case is MCLA 600.2166; MSA 27A.2166, which reads as follows:

"(1) In any action by or against a person incapable of testifying, a party's own testimony shall not be admissible as to any matter which, if true, must have been equally within the knowledge of the person incapable of testifying, unless some material portion of his testimony is supported by some other material evidence tending to corroborate his claim.

"(2) A 'person incapable of testifying' includes any individual who is incapable of testifying by reason of death or incompetency and his heirs, legal representatives or assigns; and includes any individual, corporation or other entity, or the successors thereof, whose agent, having material knowledge of the matter, is incapable of testifying by reason of death or incompetency. A 'party's own testimony' includes the testimony of his agents, successors, assigns, predecessors or assignors.

"(3) In any such actions, all entries, memoranda and declarations by the individual so incapable of testifying, relevant to the matter, as well as evidence of his acts and habits of dealing tending to disprove or show the improbability of the claims of the adverse party, may be received in evidence."

Under the new statute the proffered testimony of the plaintiff that she paid the premium due July 1, 1966, during the grace period by giving to the agent of defendant the cash therefor together with the notice of premium due only becomes admissible provided some material portion of her

testimony was supported by some other material evidence tending to corroborate her claim.

The trial court did not rule on this aspect of the case because it determined that MCLA 600.2160; MSA 27A.2160, the old statute in effect at the time of the death of Mr. Sherberneau, was controlling. That statute did not contain the provision permitting the testimony to be admitted provided it was supported by some other material evidence tending to corroborate her claim.

It is now necessary to search the record to determine if there was such other evidence present in the case. Mr. Bernard Brown, district manager for the defendant, testified in part as follows:

*"Q. [Cross-examination by Mr. Forster]:* I believe you testified from this card that you identified that indicates the payments on the premiums. What did you call this card?

*"A.* We call that a renewal card.

*"Q.* A renewal card?

*"A.* Yes.

*"Q.* You testified that the July 1st payment was not paid?

*"A.* That's correct.

*"Q.* You do not know this for sure, do you?

*"A.* We have no record of payment.

*"Q.* Well, in other words you're saying according to the records you have that the premium was not paid, is that correct?

*"A.* That's correct.

*"Q.* Now, let's assume—could a policy holder make a payment to one of your representatives in the field or to a representative at your branch office here and would that be payment on the policy?

*"A.* The terms of the contract would state that a payment to an authorized representative of the company constitutes payment.

*"Q.* So it's more or less immaterial whether or not this is entered on your records as such. In other words,

in fact a premium could be paid and not indicated on your records, is that correct?

*"The Court:* Is it possible?

*"A.* Well, of course it's possible.

*"The Court:* All right. Thank you.

*"Q.* Now, after Mr. Sherberneau's death he had some additional money in his account with your company that you could not attribute to any given policy, is that true?

*"A.* That was true.

*"Q.* And how much money was in that?

*"A.* Approximately $54 as I recall, in addition to the company or the premiums that the cash sheet called for.

*"Q.* $54?

*"A.* Yes.

*"Q.* And what was the amount of the premium due on July 1 on Mr. Sherberneau's policy?

*"A.* I believe it was $40 and some cents. I don't have the record here, around 49.

*"The Court:* Perhaps this could—

*"Witness (Interposing):* I can't determine. It was approximately $40. The original premium was $36.20 and then it was increased later to an additional five-forty-three. I just can't determine the exact amount. It was in the area of $40.

*"Q.* Where could we find this? It would have to be on some of your records would it not?

*"A.* Well, this—our record just doesn't show the exact —the record shows $36.20 due here. The policy was originally issued calling for a premium of $36.20. This premium was to be increased I believe in the third year and then the company experienced—through company experience they decided not to increase the premium until later and whether that was increased right at that time or not I'm not sure.

*"Q.* You mean from your records—

*"A. (Interposing):* From my records, yes.

*"Q.* You cannot tell me for sure what the premium was—

*"A. (Interposing):* No.

"*Q.* on this policy?

"*A.* I can't from this record.

"*Q.* Well, let's go back to the January 1st payment. What was the premium that was due then?

"*A.* According to this it was $36.20 and I believe that was the amount paid but I—I can't tell from this just whether that was increased on the following premium or not. I'm sorry.

"*Mr. Menmuir:* Mr. Forster, if it's important we can get from the home office the exact billing that was made for this July 1st premium, that is, whether it was $40.30 or $36.20.

"*Mr. Forster:* Well, I think the only point we are trying to make here is that you have introduced these records to prove your case here and I'm just demonstrating that it appears they don't know exactly what should be on these records. I'm trying to point out to the Court that I don't think these records are infallible and it appears from the witness's testimony that they are not.

"*Mr. Menmuir:* Well, if you will give us your policy that you introduced—

"*Witness:* Well, according to the record it calls for $36.20.

"*Q.* Mr. Brown, would it be fair to say that from your records we do have an area of confusion as to the premiums due?

"*A.* According to our records it calls for a premium of $36.20.

"*Q.* And according to your record on the January 1st premium was that the same amount?

"*A.* Yes.

"*Q.* And according to your records was that the amount in fact paid?

"*A.* Yes. I don't have that sheet that shows but it was paid according to the renewal card, yes. The amount of premium due was paid, yes.

"*Q.* Now, is it common practice for your company on life policies such as the one we have before us this morning—is it permissible for any member of a household of the insured to come in to pay the premium?

"*A.* Yes, within the grace period.

"*Q.* In other words, there is no prohibition about who pays the premium?

"*A.* No. We accept premiums from—within the grace period.

"*Q.* And this would be a valid payment as far as you're concerned?

"*A.* Yes.

"*Mr. Forster:* Could I have just a second, your Honor?

"*The Court:* Yes.

"*Q.* Now, Mr. Brown, you have testified after Mr. Sherberneau's death you found an overage of $54 or approximately $54?

"*A.* Yes.

"*Q.* What happened to this money?

"*A.* If I may refer to a report I made—is that all right?

"*Mr. Forster:* Fine.

"*A.* Mr. Sherberneau was helping us or servicing an additional agency at that time so I'll refer to the complete report I made of the account books. Following my interview with Mrs. Sherberneau on the date of the death I secured the account books for the agencies that Mr. Sherberneau had been servicing.

"*The Court:* Which ones were those please?

"*Witness:* The agencies were his own, Number 79 and another one, Number 6. We had a man on disability and he was assisting us.

"*The Court:* What area would that cover please?

"*Witness:* These were all in Traverse City.

"*The Court:* Very well.

"*A.* Now, the account books were—contained his wallet with funds totaling approximately $150 including a check. Now, the form 342—and that is this agent's record of payments received—required a deposit of $94.47, which Mr. Sherberneau had collected on the day of his death following his deposit that morning and his interview with his agency manager, Mr. Bell. This deposit was made following completion of account for an account for agency 6. An account was also completed for his agency 79. This account showed a—there was a $1.81 to balance it and that was deposited for the form

342. Following completion of the accounts and deposits from the funds in possession a surplus of cash remained totaling approximately $54. $24.38 of this total was used to pay family premiums with Mrs. Sherberneau's approval, weekly premiums of $3.24 and monthly premiums of $21.14. During the servicing of the agency there was a deficiency on a couple of accounts amounting to a small amount. There was one month difference in one account which called for a payment of $5.48 and another one for $1.25. The books were corrected. Now, there was a partially completed application found among Mr. Sherberneau's papers following his death. A call was made to investigate this application. The applicant—do you want names?

"*Mr. Forster:* Yes, please.

"*Witness (Continuing):* was a Mrs. Pauline Champagne. Mrs. Champagne held a receipt for $20 which had been paid to Mr. Sherberneau on the date prior to his death, August 2nd. The money had not been deposited and was returned to Mrs. Champagne as she stated she had started work and would be covered under a group contract and did not wish to proceed. This was returned. Now, a small amount of change was refunded to Mrs. Sherberneau following the settlement of the accounts. No other items occurred where money was collected and not deposited. This is the total of the—of our investigation.

"*Q.* Now, from your report after the settlement was made how was this money returned to Mrs. Sherberneau?

"*A.* It was given to her in cash I believe. I did not handle it.

"*Q.* And what was the amount of that refund?

"*A.* I don't have that. A small amount of change was refunded following settlement of the account. I don't know the amount. I think at that time it was under $1.

"*Q.* Now, did you have an occasion to call on Mrs. Sherberneau shortly after the funeral of Mr. Sherberneau?

"*A.* Yes, I did.

"*Q.* And did you go out to her house?

"*A.* I did.

"*Q.* And do you remember when or on' what date the funeral was?

"*A.* It was Saturday as I recall.

"*Q.* And what day did you come out to her house?

"*A.* I don't remember the exact day. It was during the following week.

"*Q.* The following week of the funeral?

"*A.* Yes.

"*Q.* And what was the purpose of your trip out to her house?

"*A.* The purpose was to assist Mrs. Sherberneau in the completion of the claim for payment of his—payment of the amounts due under his insurance contracts.

"*Q.* Now, was it at this time that you—your company or you first informed Mrs. Sherberneau about the so-called nonpayment of the premium under this policy we are talking about?

"*A.* Yes. As I recall we discussed it at that time.

"*Q.* And who was present during that conversation?

"*A.* I think it was Mrs. Sherberneau and as I recall, her daughter.

"*Q.* And did you tell her at that time there was a policy that had lapsed for nonpayment of premium?

"*A.* Yes.

"*Q.* And did Mrs. Sherberneau respond to that?

"*A.* I can't recall our conversation. I merely stated I —I pulled these cards out of the file and went out and we went through all the papers and I stated that the— this policy had not been paid, the premium on it that was due had not been paid, but I don't recall—I mean that's as close as I can come to our conversation.

"*Q.* And she made no response to that when you made that statement?

"*A.* Oh, I'm sure she did but I can't recall it.

"*Q.* Did she say that's impossible because I just paid a premium?

"*A.* I do not remember that that was stated.

"*Q.* Mr. Brown, you have testified that some of this money—some of the $54 surplus here was used to pay some premiums on other policies for the Sherberneau family, is that correct?

"*A.* Yes.

"*Q.* And you said this was done with Mrs. Sherberneau's approval, is that correct?

"*A.* That's correct, yes.

"*Q.* When was your accounting completed?

"*A.* We completed these accounts immediately and it would have been the next day or within the next two days. I would say the 4th or 5th. We were doing accounts for both agencies to determine the status of the accounts.

"*Q.* You did not contact Mrs. Sherberneau until the following week after the funeral, is that correct?

"*A.* I don't know if she was contacted—I mean I can't say as to when any further contact was made. I'm sorry. This goes back too long for me.

"*Q.* Do your records show when the remainder of the money was paid to Mrs. Sherberneau?

"*A.* I don't have the record of that, no.

"*Q.* Who would have made these payments?

"*A.* Who would have made the payments? Well, there were three or four people involved. We had Mr. Bell and myself doing this work and we also had one of our agents assisting us, Mr. Jones, and there was some contact made by him and it may have been refunded by him. I just don't remember. Are you speaking of the small amount of refund?

"*Q.* Yes, I am.

"*A.* I think that was done by Mr. Jones, our agent who was assisting us."

Mrs. Sherberneau testified on rebuttal in part as follows:

"*Q. [Mr. Forster]:* Mrs. Sherberneau, were you in the courtroom when Mr. Brown testified they had a surplus of $54 in your husband's account?

"*A.* Yes, sir.

"*Q.* Would you tell the court whether or not the $54 was ever returned to you?

"*A.* Not in that amount.

"*Q.* Would you tell the court in what amounts or how or what money has been returned to you?

"*A.* There were some premiums that were paid and the difference was given to me to make up $25. I believe it was 38 cents in change. I have the record in my purse.

"*Q.* Did you receive any other money?

"*A.* Yes. About a month—now this was on the 29th day of August that Mr. Jones came out and gave me the difference to make up the $25. About a month later he came out and gave me—no. He came to the office and gave me $6 and about two months later he came to the office and gave me another $5. Each time he told me it was overage in my husband's account.

"*Q.* Now, would you identify this man who gave you this money? What was his name again?

"*A.* Lawrence Jones.

"*Q.* And who is Mr. Jones? Where does he work?

"*A.* I believe he works for Metropolitan Life Insurance Company and he may be a special agent. This I'm not sure of.

"*Q.* But it's your testimony that you were refunded $25 with the request that part of that was to be paid on other premiums?

"*A.* Right.

"*Q.* And they returned the change to you, is that correct?

"*A.* That is right.

"*Q.* And then on two other occasions they returned $5 to you and then $6?

"*A.* That is correct.

"*Q.* Have you received any other money from them?

"*A.* Yes.

"*Q.* I mean coming out of this overage.

"*A.* No.

"*Q.* Have you ever been given an accounting of this overage?

"*A.* No.

"*Mr. Forster:* I have no further questions, Mr. Menmuir."

Mr. Brown's testimony was continued after Mrs. Sherberneau's rebuttal testimony upon questioning by the court as follows:

"*The Court:* Do either of you gentlemen have any statements to make at this time? Before we commence, Mr. Forster, Mr. Brown, one point in your testimony I believe you said there was some $54 that—some figure along in there.

"*Mr. Brown:* Yes.

"*The Court:* Nobody seemed to be able to account for that. What eventually became of that, do you know?

"*Mr. Brown:* Yes. I made a—we used a $1.81 to balance the accounts.

"*The Court:* Which accounts?

"*Mr. Brown:* Let me get this straight here. The account that we completed called for a $1.81.

"*The Court:* That would be this?

"*Mr. Brown:* This agency 79.

"*The Court:* What's agency 79?

"*Mr. Brown:* That was his account. That was his agency.

"*The Court:* Very well.

"*Mr. Brown:* Then we showed $24.38 of this total in the payment of family premiums. Then there was a couple of cases in the field which were revealed a little later totalling—there was one that called for a deposit of $5.84 and another for $1.25. These were discrepancies in the accounting in the field and that—and then the $20 that was returned to the applicant referred to. Now, that's the total. I can add that up. That total I gave you is $53.28."

It was found by the trial court and not disputed herein that the premium due July 1, 1966, on the policy of insurance in question was $36.20. Defendant testified that Mr. Sherberneau's account indicated that there was an overage of $54 which was not earmarked for any particular account. This $54 was considered by the defendant to be an

overage until the defendant determined that certain of these monies should be allocated for certain purposes. According to defendant $25 was determined to belong to Mrs. Sherberneau which was disposed of by paying policy premiums on members of her family in the amount of $24.38 after her permission had been obtained, and she was given the balance of 62 cents in cash. Mrs. Sherberneau testified that she permitted defendant to pay said premiums because she did not know what else to do. This took place on August 29, 1966. She further testified that a Mr. Jones, a representative of defendant insurance company, made two additional payments representing a part of the overage of her husband's account, approximately one and two months later—the one payment of $6 and the other of $5. The fact that these payments were made to Mrs. Sherberneau by Mr. Jones was not refuted by any testimony of defendants.

According to the record Mr. Sherberneau had $54 more than required in his account on August 3, 1966, and defendant proceeded to dispose of this overage by the application of the money for various purposes, as selected by defendant. The following significant facts stand out very clearly in the record:

1) That the district manager, Mr. Bernard Brown, admitted that the premium could have been paid even though the renewal record in the office did not disclose that it had been paid.

2) That the defendant picked out the purposes for which the overage was to be allotted.

3) That $25 of the overage was considered by defendant company on August 29, 1966, to belong to Mrs. Sherberneau and requested her permission to use $24.38 of it to pay premiums on policies on members of the family—this money could have

been considered as a part payment of the premium in question and she could have been requested to make payments out of her own funds on the family policies.

4) Mrs. Sherberneau testified that there were two additional payments made by Mr. Jones, a representative of defendant company, of $6 and $5 respectively, purportedly a part of the overage in Mr. Sherberneau's account.

5) The $25 paid or credited to Mrs. Sherberneau on August 29, 1966, and the two other payments of $6 and $5 equals $36 which is very, very close to the $36.20 due on the subject premium defendant claims was not paid.

We are constrained to rule that the offer of plaintiff's testimony that the premium was paid to an agent of defendant should have been received on the regular record because a material portion of her testimony, *i.e.,* that she had paid the premium to Mr. Sherberneau, was supported by other material evidence as hereinbefore set forth tending to corroborate her claim.

Reversed and remanded for a new trial.

Costs to plaintiff.

All concurred.